Slip Op. 04 - 134

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - - -x
ALLOY PIPING PRODUCTS, INC., FLOWLINE
DIVISION, MARKOVITZ ENTERPRISES, INC., :
GERLIN, INC., and TAYLOR FORGE STAIN-
LESS, INC.,                            :

                          Plaintiffs,  :
                                          Consolidated
              v.                       : Court No. 02-00124

UNITED STATES OF AMERICA and THE UNITED:
STATES DEPARTMENT OF COMMERCE,
                                       :
                          Defendants.
                                       :
- - - - - - - - - - - - - - - - - - - -x

Memorandum & Order


[Upon motion(s) for judgment on the agency
 record, remand to the International Trade
 Administration for recalculation of general
 and administrative expenses and reconsider-
 ation of indirect selling expenses.]


                              Decided: October 28, 2004


        Collier Shannon Scott, PLLC (David A. Hartquist and Jeffrey S.
Beckington) for the plaintiffs.

        Miller & Chevalier Chartered (Peter J. Koenig) for Ta Chen
Stainless Steel Pipe, Ltd.

        Peter D. Keisler, Assistant Attorney General; David M. Cohen,
Director, and Patricia M. McCarthy, Assistant Director, Commercial
Litigation Branch, Civil Division, U.S. Department of Justice
(Richard P. Schroeder); and Office of Chief Counsel for Import
Administration, U.S. Department of Commerce (Rachael E. Wenthold),
of counsel, for the defendants.


        AQUILINO, Judge: This case consolidates complaints filed

pursuant to 19 U.S.C. §1516a(a)(2)(A)(i)(I) and (2)(B)(iii) on

behalf of Ta Chen Stainless Steel Pipe, Ltd. ("TCSSPL"), CIT No.

02-00115, and on behalf of the above-encaptioned plaintiffs, each

seeking judicial review of and relief from <u>Certain Stainless Steel Butt-Weld Pipe Fittings From Taiwan: Final Results of Antidumping Duty Administrative Review</u>, 66 Fed.Reg. 65,899 (Dec. 21, 2001), promulgated by the International Trade Administration, U.S. Department of Commerce ("ITA"). The relief they seek is posited in motions pursuant to USCIT Rule 56.2 for judgment upon the agency record compiled in connection with that determination.

The jurisdiction of the court to hear and decide the parties' motions is based upon 28 U.S.C. §§ 1581(c), 2631(c).

I

TCSSPL's complaint[1] alleges that it is a Taiwanese producer and exporter of stainless steel butt-weld pipe fittings and that it was a party to the ITA administrative review at issue, which resulted in a weighted-average margin of dumping by it of 6.11 percent. <u>See</u> 66 Fed.Reg. at 65,900. The complaint and Rule 56.2 motion contest this final result on grounds (a) that the ITA ignored inventory-carrying and credit costs incurred by TCSSPL's subsidiary, Ta Chen International Corp. ("TCI"), in the United States, thereby overstating profit; (b) that the agency failed to make a level-of-trade adjustment; and (c) that the ITA's failure to

---

[1] Alloy Piping Products, Inc. *etc. et al.* obtained leave to intervene in CIT No. 02-00115 as parties defendant. TCSSPL did not seek similar leave in plaintiffs' subsequently-filed, above-numbered action, into which No. 02-00115 has now been consolidated.

allocate TCI freight costs between warehouses only to sales of sub-
ject merchandise was not in accordance with law.[2]

As recited by this motion itself, the statutory standard for the court's review in an action such as this is whether the agency's determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law".  19 U.S.C. § 1516a(b)(1)(B)(i).

A

The ITA's Final Results adopt its December 10, 2001 *Issues and Decisions Memorandum* ("DecMemo") for the underlying administrative review and "list[] the issues raised and to which we have responded, all of which are in the *Decision Memorandum*".  66 Fed.Reg. at 65,900.  That memorandum, the contents of which have been reproduced along with TCSSPL's motion, states that it is

> the Department's practice to calculate the CEP profit ratio based on actual expenses, not imputed expenses.  In a recent antidumping duty administrative review, the Department articulated that "normal accounting principles only permit the deduction of actual booked expenses, not imputed expenses, in calculating profit.  Inventory-carrying costs and credit expenses are imputed expenses, not actual booked expenses, so we have established a practice of not including them in the calculation of total actual profit."[3]

---

[2] Contingent upon affirmative relief on these claims is TCS-SPL's prayer that the underlying antidumping-duty order, published at 58 Fed.Reg. 33,250 (June 16, 1993), be revoked "on the basis of three years . . . of sales of fittings by [it] at not less than fair value, which qualifies [it] for revocation under [the ITA]'s regulation 19 CFR §351.222(b)."  TCSSPL Rule 56.2 Memorandum, p. 22.

[3] Id., Appendix, Tab 10, p. 17.  The acronym "CEP" refers to constructed export price pursuant to 19 U.S.C. §1677a(b).

That is, the crux of the controversy is the refusal to factor *imputed* expenses.  This practice apparently draws upon Import Administration Policy Bulletin 97/1, <u>Calculation of Profit for Constructed Export Price</u>, and upon certain, recent caselaw, <u>e.g.</u>, <u>U.S. Steel Group v. United States</u>, 225 F.3d 1284, 1290-91 (Fed.Cir. 2000); <u>Ausimont SPA v. United States</u>, 25 CIT 865, 893 (2001).[4]

That caselaw is predicated, of course, upon the Trade Agreements Act of 1979, as amended, in particular the special rule for determining profit per 19 U.S.C. §1677a(f) in the context of constructed export price.  TCSSPL contends, among other things, that the ITA's approach (1) is not in accordance with that section of the statute, (2) violates the statutory mandate to calculate CEP profit only for subject merchandise, and (3) violates the obliga- tions of the United States under Articles 2.3 and 2.4 of the Agree-

---

[4] The DecMemo does point out, however, that in both <u>SNR Roule- ments v. United States</u>, 24 CIT 1130, 118 F.Supp.2d 1333 (2000), and <u>FAG Italia, S.p.A. v. United States</u>, 24 CIT 1311 (2000), the court

> held that Commerce's CEP methodology with respect to imputed expenses was not in accordance with law.  The United States has appealed both judgments.  However, in Ausimont SPA v. United States, . . . the Court sustained Commerce's methodology. Consequently, until such time as these decisions are final, the Department will continue to apply its current methodology in excluding imputed expenses when calculating profit.

TCSSPL Rule 56.2 Memorandum, Appendix, Tab 10, p. 18.

Insofar as the undersigned has been able to determine, the government's appeals in <u>SNR</u> and <u>FAG</u> remain *sub judice* under Fed- eral Circuit docket numbers 01-1327 and 02-1096, respectively.

ment on the Implementation of Article VI of the General Agreement

on Tariffs and Trade 1994 ("WTO Antidumping Agreement").   See

TCSSPL Rule 56.2 Memorandum, pp. 3-13.

(1)

According to the statute, 19 U.S.C. §1677a(b), con-
structed export price means the price at which the subject

merchandise is first sold in the United States to a purchaser not

affiliated with the producer or exporter, as adjusted under subsec-

tions (c) and (d) of 1677a.  For the purposes of subsection (d),

the price used to establish CEP shall be reduced by "the profit

allocated to the expenses described in paragraphs (1) and (2)"[5],

which include the amount of any

> (A) commissions for selling the subject merchandise
> in the United States;
>
> (B) expenses that result from, and bear a direct
> relationship to, the sale, such as credit expenses,
> guarantees and warranties;
>
> (C) . . . selling expenses that the seller pays on
> behalf of the purchaser; and
>
> (D) . . . selling expenses not deducted under sub-
> paragraph (A), (B), or (C)[.]

19 U.S.C. §1677a(d)(1).  Section 1677a(f) sets forth the special

rule for determining profit as follows:

> (1) In general
>
> For purposes of subsection (d)(3) of this section,
> profit shall be an amount determined by multiplying the
> total actual profit by the applicable percentage.

---

[5] 19 U.S.C. §1677a(d)(3).

(2) Definitions

For purposes of this subsection:

(A) Applicable percentage

The term "applicable percentage" means the percentage determined by dividing the total United States expenses by the total expenses.

(B) Total United States expenses

The term "total United States expenses" means the total expenses described in subsection (d)(1) and (2) of this section.

(C) Total expenses

The term "total expenses" means all expenses in the first of the following categories which applies and which are incurred by or on behalf of the foreign producer and foreign exporter of the subject merchandise and by or on behalf of the United States seller affiliated with the producer or exporter with respect to the production and sale of such merchandise:

(i) The expenses incurred with respect to the subject merchandise sold in the United States and the foreign like product sold in the exporting country if such expenses were requested by the [ITA] for the purpose of establishing normal value and constructed export price.

(ii) The expenses incurred with respect to the narrowest category of merchandise sold in the United States and the exporting country which includes the subject merchandise.

(iii) The expenses incurred with respect to the narrowest category of merchandise sold in all countries which includes the subject merchandise.

> (D) Total actual profit
>
> The term "total actual profit" means the total profit earned by the foreign producer, exporter, and affiliated parties described in subparagraph (C) with respect to the sale of the same merchandise for which total expenses are determined under such subparagraph.

In other words, CEP profit[6] equals total profit times total U.S. expenses divided by total expenses. TCSSPL is of the view that total expenses should include those that are imputable, while the defendants contend that that approach would amount to double counting of interest. Compare TCSSPL Rule 56.2 Memorandum, pp. 5-6 with Defendants' Memorandum, pp. 38-39.

As this court reads the foregoing statutory language, Congress has not directly spoken to the precise question at issue, whereupon it must determine whether the ITA's interpretation "is based on a permissible construction of the statute." Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984). See, e.g., U.S. Steel Group v. United States, 225 F.3d at 1286-87. In that case, the court upheld the agency's interpretation of section 1677a(f)(2)(C), supra, to include "movement expenses" in the denominator of the CEP ratio because the statute "does not require or even vaguely suggest symmetry between the definitions of U.S. expenses and total expenses." 225 F.3d at 1290 (internal quotation marks deleted). Moreover, total U.S.

---

[6] The parties' papers refer to "CEP profit" instead of "profit" and "CEP profit ratio" rather than "applicable percentage".

expenses are not a subset of total expenses because the "statute itself defines total U.S. expenses distinctly, both structurally and substantively, from total expenses." Id. at 1289. In Timken Co. v. United States, 26 CIT ___, 240 F.Supp.2d 1228 (2002), aff'd, 354 F.3d 1334 (Fed.Cir. 2004), the court upheld the ITA's decision not to impute expenses in calculating total expenses:

> . . . [A]lthough the definitions of both total U.S. expenses and total expenses direct Commerce to include a figure for selling expenses, it is not clear from the statute that these figures need to be precisely the same.

26 CIT at ___, 240 F.Supp.2d at 1246.

TCSSPL reads Thai Pineapple Canning Indus. Corp. v. United States, 23 CIT 286 (1999), and Ausimont SPA v. United States, supra, to

> indicate that the CEP Profit of the subject merchandise must be accurately calculated, including considering any unaccounted for imputed costs as to the subject merchandise in particular.

TCSSPL Reply Brief, p. 5. In Thai Pineapple, the court remanded the issue of imputed expenses to the ITA with instructions to explain on the record whether the excluded imputed expenses in the denominator of the CEP profit ratio were in fact a part of an expense which was allocated to U.S. sales. See 23 CIT at 296-97. And, if that was the case, then the agency would need to support its conclusion with citations to that record. Id. at 296.

. . . It may not be an unreasonable interpretation to conclude that imputed expenses should be excluded in the actual profit calculation, if that construction can be squared with the necessity of a properly calculated statutory ratio.  It is a proper ratio that ensures proper allocation of profit to U.S. sales.  If the profit allocable to CEP is somewhat lower because U.S. expenses are made higher by the addition of imputed expenses, this would not seem to be antithetical to the statute.  There is also nothing that categorically prevents the inclusion of imputed expenses.  Rather, imputed expenses should be omitted from actual profit if they duplicate expenses already accounted for.  Their inclusion is not *per se* incompatible with the use of the word "actual."  The question is whether the imputed expenses represent some real, previously unaccounted for, expense.

Id.  After receipt of the results of the remand, the court stated:

Theoretically, the total expenses denominator would reflect the interest expenses captured in the U.S. sales expenses numerator specified in 19 U.S.C. §1677a(f)(2)-(B), as well as "home" market interest expenses, because the total expenses denominator is derived from a net unit figure based on all company interest expenses without regard to sales destination.  . . . The issue is whether there is some peculiarity of this case that belies the relevancy of the theory.

Thai Pineapple Canning Indus. Corp. v. United States, 24 CIT 107, 115 (2000), aff'd in part, rev'd in part on other grounds, 273 F.3d 1077 (Fed.Cir. 2001).  The court(s) sustained the ITA's methodology for CEP profit calculation because the plaintiffs did not demonstrate "any great discrepancy".  Id.  The court(s), however, did not address what would be a "truly distortive situation[]".  Id., n. 13.  Cf. SNR Roulements v. United States, 28 CIT ___,___, Slip Op. 04-100, p. 9 (Aug. 10, 2004):

. . . Commerce's findings may be challenged (1) by demonstrating that a distortion was caused by different expenses over time or (2) that the inclusion of imputed expenses will not result in double counting because there were no actual U.S. expenses included in the actual booked expenses.

Here, TCSSPL claims that there is an "enormous" discrepancy; namely, imputed expenses total 17.3 percent, whereas actual interest costs are 1.37 percent. TCSSPL Rule 56.2 Memorandum, p. 7. It further asserts that including imputed expenses in the denominator of the CEP profit ratio would eradicate the dumping margin. See id. at 13.

This court cannot find, however, that the "imputed expenses represent some real, previously unaccounted for, expenses" because the actual interest cost, 1.37 percent, is allocated to selling expenses, which are included in the figure for "total expenses". See Plaintiffs' Reply Brief, Appendix 6, lines 651-92. That imputed expenses are greater than actual expenses does not necessarily engender an actionable distortion. Compare Ta Chen Stainless Steel Pipe, Ltd. v. United States, 28 CIT ___, ___, Slip Op. 04-46, p. 22 (May 4, 2004)("The evidence of record suggests that the agency's CEP profit methodology in this case . . . may have distorted the allocation of profit to TCI's U.S. sales"[7]),

---

[7] That issue was remanded to the ITA by the court in Ta Chen, and, on August 26, 2004, the agency filed its Final Results Pursuant to Remand, which state at pages 11-12, in pertinent part, that it tested the plaintiff's thesis and found that approach "flawed":

(footnote continued)

with SNR Roulements v. United States, supra, Slip Op. 04-100, pp.
9-10 ("SNR has failed to demonstrate any peculiarity or discrepancy
which necessitates the inclusion of imputed expenses because they
are not otherwise accounted for").

(2)

As recited above, section 1677a(f)(2)(C) provides that
the term "total expenses" means all expenses in the first of three
enumerated subcategories which applies.  TCSSPL points out that the
ITA normally

> will use the aggregate of expenses and profit for all
> subject merchandise sold in the United States and all
> foreign like products sold in the exporting country.

TCSSPL Rule 56.2 Memorandum, p. 7, quoting 19 C.F.R. §351.402(d)(1)
(underscoring in original).  But it misreads the legislative
history of the Uruguay Round Agreements Act, Pub. L. No. 103-465,
108 Stat. 4809 (Dec. 8, 1994), taking the position "that profit on

_____

> . . . According to the Department's methodology, the
> imputed interest expenses are already reflected in the
> recognized financial expenses, which is included in the
> cost of merchandise in the denominator and the multiplier
> of the CEP profit equation.  By adding the imputed in-
> terest expenses to the denominator and the multiplier,
> these amounts are then double-counted in the denominator
> and in the multiplier, such that the denominator and the
> multiplier would have both the recognized amount and the
> imputed measurement of the respondent's interest expens-
> es.  Furthermore, the CEP profit equation applied . . .
> is not accurate or symmetrical.  By adding only the U.S.
> imputed interest expenses, but ignoring the home market
> imputed interest expenses and any imputed expenses re-
> lated to production, purchasing, financing, or adminis-
> trative activities, this version places undue emphasis on
> Ta Chen's imputed U.S. selling expenses.

subject merchandise is to be used in the CEP Profit deduction."

Id.  Rather, H.R. Rep. No. 103-826(I) (1994) states at page 81:

> . . . No distortion in the profit allocable to U.S. sales
> is created if total profit is determined on the basis of
> a broader product-line than the subject merchandise, be-
> cause the total expenses are also determined on the basis
> of the same expanded product line.  Thus, the larger
> profit pool is multiplied by a commensurately smaller
> percentage.

Accord:  Statement of Administrative Action, H.R. Doc. No. 103-316,

vol. 1, p. 825 (1994).  Hence, this court cannot conclude that the

agency did not act in accordance with law when it decided to use a

broader product line, instead of solely the subject merchandise, in

calculating total actual profit.

(3)

TCSSPL contends that the ITA's exclusion of imputed

expenses violates Articles 2.3 and 2.4 of the WTO Antidumping

Agreement because, "[r]ead together, these provisions require that

allowances made for CEP profit relate to the subject merchandise."

TCSSPL Rule 56.2 Memorandum, p. 12.  The court does not concur.

Recognizing that U.S. statutes should not be read so as to be in

conflict with the country's international obligations[8], the court

---

[8] See, e.g., Federal Mogul Corp. v. United States, 63 F.3d
1572, 1581 (Fed.Cir. 1995); Murray v. Schooner Charming Betsy,
6 U.S. (2 Cranch) 64, 118 (1804).  See also Statement of Admini-
strative Action, H.R. Doc. No. 103-316, vol. 1, p. 669 (1994):

(footnote continued)

does not find that the agency's exclusion herein runs afoul of the
language in either GATT article.

                                    B

        TCSSPL points out that TCI is a "master distributor"[9],
responsible for all selling and distribution in the U.S. market to
other distributors.

> . . . It is TCI in the United States, not TC[SSPL], that
> takes the [] Taiwan mega-shipments . . . and performs the
> enormous selling effort associated with 22,998 individ-
> ual TCI[] sales (as well as shipment and packing there-
> of) to unaffiliated U.S. customers.  As a result, TC-
> [SSPL]'s selling effort for its much smaller home market
> sales, per unit of home market sale, far exceeds that of
> its sales to its U.S. affiliate, with such differences in
> selling effort warranting an LOT [level-of-trade] ad-
> justment.  The fact that TC[SSPL] is dealing with  . . .
> TCI . . . means far less effort is required, as compared
> to dealing with its many unaffiliated home market cus-
> tomers . . ..

TCSSPL Rule 56.2 Memorandum, pp. 14-15 (citations omitted).


        According to the statute, constructed export price shall
be

> increased or decreased to make due allowance for any
> difference . . . between . . .[it] and [normal value]

---

> . . . The implementing bill, including the authority
> granted to federal agencies to promulgate implementing
> regulations, is intended to bring U.S. law fully into
> compliance with U.S. obligations under those agreements.
> The bill accomplishes that objective with respect to
> federal legislation by amending existing federal statutes
> that would otherwise be inconsistent with the agreements
> and, in certain instances, by creating entirely new
> provisions of law.

[9] TCSSPL Rule 56.2 Memorandum, p. 14.

. . . that is shown to be wholly or partly due to a difference in level of trade . . . , if th[at] difference . . .

      (i) involves the performance of different selling activities; and

      (ii) is demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at different levels of trade in the country in which normal value is determined.

19 U.S.C. §1677b(a)(7)(A).  Subsection (a)(7)(B) proceeds to provide for an offset

[w]hen normal value is established at a level of trade which constitutes a more advanced stage of distribution than the level of trade of the constructed export price . . ..

Cf. 19 C.F.R. §351.412(c)(2) (2001):

*Differences in levels of trade.*  The Secretary will determine that sales are made at different levels of trade if they are made at different marketing stages (or their equivalent).  Substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing.  Some overlap in selling activities will not preclude a determination that two sales are at different stages of marketing.

The evidence on the record led the ITA to conclude that the sales of the subject merchandise were made at the same level of trade.  That is, TCSSPL's position did "not withstand close scrutiny."  TCSSPL Rule 56.2 Memorandum, Appendix, Tab 10, p. 13.  See Certain Stainless Steel Butt-Weld Pipe Fittings From Taiwan: Preliminary Results of Antidumping Duty Administrative Review, 66 Fed.Reg. 36,555, 36,558-59 (July 12, 2001).  Those Preliminary Re-

sults were affirmed in the agency's subsequent DecMemo on grounds, *inter alia*, that TCSSPL holds inventory in Taiwan prior to shipment to TCI, as well as to home-market customers; that it did not perform more selling functions for sales in Taiwan than for sales to the United States; that, while TCSSPL incurs seller's risk and handles after-sales service in the home market but not for sales here, this did not outweigh the functions it performed for those sales to TCI; and that TCSSPL had not provided enough evidence to reach the contrary conclusion that its sales at home and to TCI were in fact at different levels of trade. See TCSSPL Rule 56.2 Memorandum, Appendix, Tab 10, pp. 12-14.

Upon review of the record relevant to this agency reasoning, the court finds sufficient evidence in support thereof. As for TCSSPL's claim that the ITA erred by including in its analysis "movement" expenses rather than solely "selling" expenses[10], the statute does indeed segregate them in the context of constructed export price. Compare 19 U.S.C. §1677a(c)(2)(A) (CEP shall be reduced by "any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States") with §1677a(d)(1). While the courts agree that those costs, charges, or expenses should be disregarded by the agency when

---

[10] Id. at 16.

comparing the differences, if any, between home- and U.S.-market selling efforts[11], this court is unable to conclude that the expenditures TCSSPL refers to[12] are of that ilk.  The <u>Statement of Administrative Action</u>, H.R. Doc. No. 103-316, vol. 1, p. 823 (1994), refers to them as "transportation and other expenses, including warehousing expenses, incurred in bringing the subject merchandise from the original place of shipment . . . to the place of delivery in the United States", whereas the ITA's <u>Preliminary Results</u> herein

> found that Ta Chen's selling functions for sales to TCI include inventory maintenance to date of shipment, incurring risk of non-payment, extension of credit terms, research and development and technical assistance, aftersale services, and freight and delivery arrangement.

66 Fed.Reg. at 36,558.  Moreover, if the practice is to define movement expenses per 19 U.S.C. §1677a(c)(2)(A) as the cost of a "market transaction" between unrelated parties[13], then the transfer of subject merchandise from TCSSPL to its subsidiary TCI would not satisfy that standard.

TCSSPL's papers refer to a number of cases wherein the ITA concluded that a CEP offset was necessary.   <u>See</u> TCSSPL Rule

---

[11] <u>See</u>, <u>e.g.</u>, <u>Micron Technology, Inc. v. United States</u>, 243 F.3d 1301, 1315 n. 12 (Fed.Cir. 2001).

[12] <u>See</u> TCSSPL Rule 56.2 Memorandum, pp. 15-16.

[13] <u>See</u>, <u>e.g.</u>, <u>AK Steel Corp. v. United States</u>, 22 CIT 1070, 1088, 34 F.Supp.2d 756, 770 (1998), <u>aff'd</u> <u>in</u> <u>part</u>, <u>rev'd</u> <u>in</u> <u>part</u> <u>on</u> <u>other</u> <u>grounds</u>, 226 F.3d 1361 (Fed.Cir. 2000).

56.2 Memorandum, p. 17; TCSSPL Reply Brief, p. 15. But of course, it was the evidence on the records developed in each of those matters that supported those offsets, which is not this case at bar.

C

Genuine movement expenses are the basis of TCSSPL's contention that the ITA should have taken only those incurred in transferring subject merchandise between TCI's various, inland warehouses across the United States. The issue before the court has arisen due to the company's failure to report them in its responses to agency questionnaires. According to the DecMemo,

> [d]uring verification, TCI did not claim that the intra-warehouse transfer expenses were not reported because it did not have the information to calculate them, but stated that the expenses were de minimis and therefore not reported.

TCSSPL Rule 56.2 Memorandum, Appendix, Tab 10, p. 9. But that memorandum indicated that the ITA came to conclude otherwise:

> . . .[C]ontrary to Ta Chen's claim that the intra-ware-house[14] expense was not a major omitted expense, the evidence on the record clearly indicates that Ta Chen failed to report a major expense.

Id. at 7. Whereupon, in its final analysis the agency applied facts available in the following manner:

---

[14] According to the record, the prefix "intra" relates to "expenses TCI incurs when transferring its merchandise among its . . . warehouses in the United States." TCSSPL Rule 56.2 Memorandum, Appendix, Tab 10, p. 8.

> . . . [W]e identified the highest monthly intra-warehouse transfer expense. We then applied that month's amount to the remaining months in the POR. We then summed each month into a POR total and, in recognition of Ta Chen's accurate assessment that its records do not permit sales-specific identification of these expenses, we divided the summed total amount by TCI's POR net sales figure for all merchandise, both subject and non-subject. We then multiplied this figure by the gross unit price to arrive at the amount we deducted from CEP.

Id. at 10.

TCSSPL now complains about this approach on grounds that the ITA noted on the record that movement costs of particular merchandise could not be traced, and thus there was no duty to report transfer expenses among the TCI warehouses[15]; even if, after verification, those expenses were found to be calculable, they are nevertheless insignificant[16]; it acted in "good faith", to the best of its ability, because it provided all the necessary documents to calculate them[17]; and the facts selected by the agency among those available to choose from were punitive in nature and hence not in accordance with law[18].

------

[15] See TCSSPL Rule 56.2 Memorandum, p. 18 n. 14. In the light of the record, however, this point may well be post-hoc rationalization.

[16] See id. at 20, citing 19 C.F.R. §351.413.

[17] See TCSSPL Reply Brief, p. 18.

[18] See id. at 22, citing Timken Co. v. United States, 26 CIT ___, ___, 240 F.Supp.2d 1228, 1234 (2002)("Commerce should adhere to the overriding goal of the antidumping law, which is not to create a punitive result").

(1)

The defendants correctly point out that the statute grants the ITA the authority to decide when an adjustment is "insignificant in relation to the price or value of the merchandise."  Defendants' Memorandum, p. 23, quoting 19 U.S.C. §1677f-1(a)(2) and relying on SKF USA Inc. v. United States, 24 CIT 1100, 1113, 118 F.Supp.2d 1315, 1325 (2000).  Here, it found that the TCI warehouse transfer expenses, when ranked against other costs, were "significantly larger than the majority of [them]".  TCSSPL Rule 56.2 Memorandum, Appendix, Tab 10, p. 7.  The

> intra-warehouse transfer expenses were not small . . ..
> The [] $750,807.47 figure is significant because a ma-
> jority of the line items used to calculate the U.S. in-
> direct selling expenses . . . [we]re smaller.

Id.  That figure was subsequently reduced to $667,142,

> which only accounts for indirect selling expenses where
> we could not separate non-subject merchandise, ensuring
> that the Department did not include expenses which were
> not for subject merchandise.

Id. at 8, quoting in part the ITA Preliminary Analysis Memorandum, p. 4.

On their face, these figures do not seem insignificant, and the court cannot conclude otherwise and thereby foreclose resort to the facts available.

(2)

The statute provides for agency determinations on the basis of facts available if

(1) necessary information is not available on the record, or

(2) an interested party . . .

    (A) withholds information that has been requested by the [ITA] . . .,

    (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested . . .,

    (C) significantly impedes a proceeding . . ., or

    (D) provides such information but the information cannot be verified . . .,

the [ITA] . . . shall . . . use the facts otherwise available in reaching the applicable determination . . ..

* * *

If the [ITA] . . . finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information . . ., the [ITA] . . ., in reaching the applicable determination . . ., may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available. Such adverse inference may include reliance on information derived from--

(1) the petition,

(2) a final determination in the investigation under this subtitle,

(3) any previous review under section 1675 of this title or determination under section 1675b of this title, or

(4) any other information placed on the record.

19 U.S.C. §1677e(a) and (b). <u>See</u>, <u>e</u>.<u>g</u>., <u>Nippon Steel Corp. v. United States</u>, 337 F.3d 1373, 1381-82 (Fed.Cir. 2003).

TCSSPL takes the position now that, since it provided the agency during verification with an allocation factor for calculation of TCI warehouse transfer expenses, that fact alone should save it from the effect of reliance on the foregoing provisions. It refers to other cases in support of this position, e.g., Notice of Final Determination of Sales at Less Than Fair Value:  Static Random Access Memory Semiconductors From Taiwan, 63 Fed.Reg. 8,909, 8,928 (Feb. 23, 1998); Notice of Final Determination of Sales at Less Than Fair Value: Certain Steel Concrete Reinforcing Bars From Turkey, 62 Fed.Reg. 9,737, 9,742 (March 4, 1997); Notice of Final Determination of Sales at Less Than Fair Value:  Bicycles From the People's Republic of China, 61 Fed.Reg. 19,026, 19,044 (April 30, 1996).  In each of those matters, however, the ITA concluded that the failure to report what was a minor expense was inadvertent, which is not the circumstance reflected in the record at bar.  Cf. TCSSPL Rule 56.2 Memorandum, Appendix, Tab 10, p. 7.  As for other cases referred to for support, the court in Usinor Sacilor v. United States, 19 CIT 711, 745, 893 F.Supp. 1112, 1142 (1995), aff'd in part, rev'd in part, 215 F.3d 1350 (Fed.Cir. 1999), for example, held that the agency's determination was "procedurally unfair" because it had failed to advise the parties of the deficiencies in their submissions.  The ITA did not so fail in this matter.  In Mannesmannrohren-Werke AG v. United States, 23 CIT 826, 77 F.Supp.2d 1302 (1999), the agency considered adverse facts

warranted because a respondent failed to answer a questionnaire and had also misrepresented itself.  Upon judicial review, the court found that the ITA did not explain why the respondent's actions amounted to anything more than inadvertence and thus held that it could not apply adverse facts without reconsideration after remand of that matter.  See 23 CIT at 842-43, 77 F.Supp.2d at 1316.

But this matter now at bar does not have an appearance of respondent inadvertence.  Moreover, in Maui Pineapple Co. v. United States, 27 CIT ___, 264 F.Supp.2d 1244 (2003), another action referred to by TCSSPL, the administrative record contained the basic information, upon which corrections to the U.S. sales could be made.  That kind of information with regard to the TCI warehouse transfers is not on the record herein.

Counsel for TCSSPL would limit 19 U.S.C. §1677e(a)(1), supra, to resort to facts otherwise available "only"[19] if necessary information is not on the record, but subsection (a)(2) thereto posits four additional grounds for such resort.  And this court is required to construe the statute so as to give meaning to all of its provisions, and it thus necessarily declines to read section 1677e(a) as if subsection (2) thereto does not exist.  See, e.g., NTN Bearing Corp. of America v. United States, 368 F.3d 1369, 1377 (Fed.Cir. 2004).

---

[19] TCSSPL Reply Brief, p. 21.

(3)

The expectation of the statute that an interested party cooperate to the best of its ability has been interpreted to mean that it "do the maximum it is able to do."  Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed.Cir. 2003).  The court of appeals further explained in that case that,

> under section 1677e(b), Commerce need only make two showings.  First, it must make an objective showing that a reasonable and responsible importer would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations.  Second, Commerce must then make a subject- ive showing that the respondent under investigation not only has failed to promptly produce the requested in- formation, but further that the failure to fully respond is the result of the respondent's lack of cooperation in either: (a) failing to keep and maintain all required records, or (b) failing to put forth its maximum efforts to investigate and obtain the requested information from its records.

Id. at 1382-83 (citation omitted).

Here, the ITA determined that the use of partial *adverse* facts was warranted, based upon the following rationale:

> . . . Ta Chen's knowledge of the intra-warehouse transfer expenses and its decision not to report them to the De- partment properly warrants the use of adverse facts available.  Ta Chen did not cooperate to the best of its ability with regard to its responses [to] requests for information during the course of the administrative re- view.  It was only at the Department's request at verifi- cation that TCI offered its explanation for not reporting these expenses earlier.  At verification, TCI stated that the inland freight cost was very small and was therefore not reported.

TCSSPL Rule 56.2 Memorandum, Appendix, Tab 10, p. 9 (citation omitted). Furthermore, "Ta Chen acknowledged that TCI chose not to report these expenses even after calculating its allocation factor." Id. (citation omitted). Hence, the two showings required by Nippon, supra, are evident. TCSSPL was aware that intra-warehouse transfer expenses were ordinarily reported in an antidumping administrative review, and it failed to provide the ITA with its full cooperation, even upon request during verification.

Nonetheless, TCSSPL would have the court believe that the methodology used by the agency, specifically its decision to attribute the highest reported monthly freight rate to those sales with no reported freight during the period of review, is punitive in nature and thus not in accordance with law. See TCSSPL Reply Brief, p. 22, citing Timken Co. v. United States, 26 CIT ___, ___, 240 F.Supp.2d 1228, 1234 (2002) (the ITA must "appropriately balanc[e] th[e] goal of accuracy against the risk of creating a punitive margin"). In support of this assertion, counsel claim that the intra-warehouse allocation factor submitted during verification is a more accurate way to calculate the dumping margin. See TCSSPL Rule 56.2 Memorandum, p. 21. Additionally, TCSSPL attempts to equate the situation here with the ITA's subsequent administrative review (covering June 2000 to May 2001), wherein its allocation factor was accepted. See TCSSPL Reply Brief, pp. 21-22, citing Certain Stainless Steel Butt-Weld Pipe

<u>Fittings from Taiwan: Final Results and Final Rescission in Part of</u>

<u>Antidumping Duty Administrative Review</u>, 67 Fed.Reg. 78,417 (Dec.

24, 2002), and the accompanying Issues and Decision Memorandum, pp.

2-3 (Comment 1).

That the agency chose the highest reported monthly intra-

warehouse transfer expense to determine total such expenses does

not make that choice *per se* punitive in nature.  Rather, section

1677e(b) grants the ITA the discretion to choose among applicable

data on the record.  <u>See</u>, <u>e.g.</u>, <u>Allied-Signal Aerospace Co. v.</u>

<u>United States</u>, 996 F.2d 1185, 1191 (Fed.Cir. 1993).  Second, the

ITA did consider TCSSPL's allocation factor but chose not to rely

on it:

> . . . The Department took exhibits indicating both the
> total amount of unreported intra-warehouse transfer
> expenses and whether such expenses could be segregated
> into subject and non-subject merchandise components. The
> Department did not need to take Ta Chen's allocation
> factor because that calculation was not material to the
> total amount of the unreported expense or whether the
> expense could be segregated; it merely represents an
> argument regarding the proper treatment of the deliber-
> ately unreported expenses . . ..

TCSSPL Rule 56.2 Memorandum, Appendix, Tab 10, p. 9.

As for other ITA administrative reviews, this court

reiterates that the agency is not bound to a method used in a prior

review so long as its particular approach is supported by substan-

tial evidence on the record and otherwise in accordance with law.

Here, the ITA followed a method applied in <u>Final Results of Anti-</u>

<u>dumping Duty Administrative Review:  Certain Welded Carbon Steel</u>
<u>Pipe and Tube From Turkey</u>, 61 Fed.Reg. 69,067 (Dec. 31, 1996).
Although TCSSPL is correct to point out that there were no data on
the agency record even after verification in that matter, the
situation herein is not all that different.  To repeat, the ITA
chose not to accept the company's allocation factor "because that
calculation was not material to the total amount of the unreported
expense or whether the expense could be segregated".  On the record
presented, this court cannot hold otherwise.

D

As noted at the beginning of this part I, contingent upon
affirmative relief on these foregoing claims is TCSSPL's prayer
that the underlying antidumping duty order be revoked "on the basis
of [these] three years . . . of sales of fittings by [it] at not
less than fair value, which qualifies [it] for revocation under
[the ITA]'s regulation 19 CFR §351.222(b)."  TCSSPL Rule 56.2
Memorandum, p. 22.

Suffice it to respond at this stage that the <u>Final Re-</u>
<u>sults</u> under review entail a dumping margin for TCSSPL and that none
of its foregoing claims, in this court's judgment, eliminate it.
However, since claims by the plaintiffs, as discussed hereinafter,
lead to a remand to and consideration by the agency, final
determination of the plea for revocation should abide the results
of that remand.

II

In support of their motion for judgment upon the same agency record, the plaintiffs summarize their claims for relief as follows:

In particular, the Department erred as a matter of law . . . (1) by calculating U.S. indirect selling expenses based on fiscal year 1999 financial statements, in lieu of the information provided in the more recent and relevant fiscal year 2000 financial statements, of . . . TCI . . . ; (2) by failing to increase TCI's U.S. short-term interest rate for additional costs related to TCI's U.S. short-term financing, and thereby understating Ta Chen's U.S. credit expenses and U.S. inventory carrying costs; (3) by failing to include in Ta Chen Taiwan's cost of production and constructed value data bonuses paid by Ta Chen Taiwan to management and employees, which bonuses were distributed directly from stockholders' equity and improperly not recorded in Ta Chen's profit and loss statement, a practice that the Department previously has found to be distortive; and, (4) by accepting average direct selling expenses for Ta Chen's U.S. sales made from U.S. inventory, in lieu of import-specific direct selling expenses that could have been reported . . . based on Ta Chen's normal books and records.

Plaintiffs' Rule 56.2 Memorandum, pp. 1-2. The third of these specifications of error is labeled "C" and discussed more fully at pages 45 to 52 of this memorandum, concluding that "this issue should be remanded to the [ITA] with instructions to properly account for the various bonus payments as compensation expenses." Id. at 52. Initially, the defendants respond that

this action should be remanded to Commerce to reopen the record, seek additional relevant information regarding employee bonuses, and recalculate Ta Chen's general and administrative expenses. In all other respects, the motion[] should be denied because the administrative determination is otherwise supported by substantial evidence and otherwise in accordance with law.

Defendants' Memorandum, p. 2.  Cf. id. at 55-56.

Neither TCSSPL's counsel nor this court objects to remand on the issue indicated.  Cf. Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed.Cir. 1990) ("the basic purpose of the statute [is to] determin[e] current margins as accurately as possible"); Koyo Seiko Co. v. United States, 14 CIT 680, 683, 746 F.Supp. 1108, 1111 (1990) ("affirming a final determination *known to be based on incorrect data* would not only perpetuate the error, [i]t would also be contrary to legislative intent").

A

Plaintiffs' first specification of error is that the ITA erred in relying on five months' data from TCI's fiscal year 1999 rather than seven months' contained in the company's financial statements for fiscal year 2000 to calculate the U.S. indirect selling expenses for the period of review.  The defendants respond that the agency

> determined that TCI's FY 1999 financial statements were preferable because Ta Chen had not had an opportunity to adjust its fiscal year 2000 data for antidumping purposes in accordance with 19 U.S.C. §1677a(d). . . .  Because Ta Chen's fiscal year runs from November 1 through October 31 of the following year, and because the relevant POR ran from June of 1999 through May of 2000, Ta Chen did not have time to adjust TCI's FY 2000 financial data before Commerce needed the data for its calculations (beginning in late calender year 2000).

Defendants' Memorandum, pp. 46-47 (footnote and citation omitted).  They also contend that "when both types of information are available, Commerce acts reasonably when it selects actual in lieu

of estimated information", despite the fact that it could have
estimated the FY 2000 indirect selling expenses based on those
expenses reported in FY 1999.  Id. at 48, citing CEMEX, S.A. v.
United States, 19 CIT 587, 595-96 (1995), aff'd, 133 F.3d 897
(Fed.Cir. 1998).  Moreover, they argue that

> the FY 2000 . . . data is only slightly more contempo-
> raneous with the period of review than the 1999 fiscal
> year data used by Commerce.  Specifically, the FY 2000
> . . . data overlaps with seven months of the period of
> review.  The 1999 fiscal year data overlaps with five
> months of the period of review.  Indeed, even the data
> favored by Alloy Piping utilizes data from outside the
> period of review.

Id. at 49-50.


The governing statute, 19 U.S.C. §1677a(d)(2), provides

> for the deduction of indirect selling expenses from
> constructed export price.  Indirect selling expenses are
> expenses which do not meet the criteria of "resulting
> from and bearing a direct relationship to" the sale of
> subject merchandise, do not qualify as assumptions, and
> are not commissions.  Such expenses would be incurred by
> the seller regardless of whether the particular sales in
> question are made, but reasonably may be attributed (at
> least in part) to such sales.


Statement of Administrative Action, H.R. Doc. 103-316, vol. 1, p.
824 (1994).  Because the statute does not specify how to calculate
such expenses, the ITA can resort to the audited fiscal-year
financial statements that most closely correspond to a period of
review.  E.g., Large Newspaper Printing Presses and Components
Thereof, Whether Assembled or Unassembled, From Japan: Final Re-
sults [of] Antidumping Duty Administrative Review, 66 Fed.Reg. 11,-
555 (Feb. 26, 2001); Certain Corrosion-Resistant Carbon Steel Flat

Products and Certain Cut-to-Length Carbon Steel Plate From Canada:

Final Results of Antidumping Duty Administrative Reviews, 62 Fed.

Reg. 18,448, 18,456-57 (April 15, 1997).  On occasion, the agency

takes a different approach, which is the case here, depending on

the facts and circumstances.  That is, it

> has the flexibility to change its position providing that
> it explains the basis for its change[6] and providing that
> the explanation is in accordance with law and supported
> by substantial evidence[7].

Cultivos Miramonte S.A. v. United States, 21 CIT 1059, 1064, 980

F.Supp. 1268, 1274 (1997).[20]  Furthermore, the mere fact that re-

---

[20] In its footnote 6, the court stated that

> "[t]he underlying ground of that principle is that the
> reviewing court should be able to understand the basis of
> the agency's action and so may judge the consistency of
> that action with the agency's general mandate."  The rule
> also . . . "prohibit[s] the agency from adopting
> significantly inconsistent policies that result in the
> creation of 'conflicting lines of precedent governing the
> identical situation.'" . . . "This is not to say that an
> agency, once it has announced a precedent, must forever
> hew to it.  Experience is often the best teacher, and
> agencies retain a substantial measure of freedom to
> refine, reformulate, and even reverse their precedents in
> the light of new insights and changed circumstances.
> However, the law demands a certain orderliness.  If an
> administrative agency decides to depart significantly
> from its own precedent, it must confront the issue
> squarely and explain why the departure is reasonable."

21 CIT at 1064, 980 F.Supp. at 1274 (quotations and brackets in
original, citations omitted).  Its footnote 7 states that the

> review of an agency's change of position or practice will
> typically center on whether the action was arbitrary.  A
> change is arbitrary if the factual findings underlying
> the reason for change are not supported by substantial
> evidence.

Id.

sults can differ, depending on the method or data chosen, does not automatically render either way unlawful if there is substantial evidence[21] on the record in support of that way.  Here, the ITA came to conclude that reliance on the already-adjusted 1999 fiscal year data, as opposed to estimating adjustments to TCI's FY 2000 financial statements, would lead to a more accurate margin.  <u>See</u> Defendants' Supplemental Appendix, pp. 29-30.  On its face, that approach was not contrary to law.  <u>Cf</u>. <u>Ta Chen Stainless Steel Pipe, Ltd. v. United States</u>, 28 CIT ___, ___, Slip Op. 04-46, pp. 23-25 (May 4, 2004).

Nonetheless, according to the plaintiffs, the ITA failed to consider all of TCI's indirect U.S. selling expenses for fiscal year 1999.  <u>See</u> Plaintiffs Rule 56.2 Memorandum, pp. 23-24.  Indeed, it does appear that the agency took that year's interest expense only for TCI operations (and not for financing) into account.  <u>See</u>, <u>e</u>.<u>g</u>., <u>id</u>., pp. 39-40 and notes 124-26.  That is, "the U.S. indirect selling expenses submitted by Ta Chen were wrong and should be corrected."  <u>Id</u>. at 40. Upon review of the record, the court concurs.

B

A compensating balance is an "amount of money a bank requires a customer to maintain in a non-interest bearing account,

---

[21] "Substantial evidence . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938); <u>Matsushita Elec. Indus. Co. v. United States</u>, 750 F.2d 927, 933 (Fed.Cir. 1984).

in exchange for which the bank provides . . . free services."
*investorwords.com* at http://www.investorwords.com/.  "Compensating
balances increase the effective rate of interest on borrowings."
Barron's Dictionary of Finance and Investment Terms, p. 110 (5th
ed. 1998).  TCSSPL reported a compensating balance on an "old loan"
in response to an ITA supplemental questionnaire.  The agency
thereafter stated:

> . . . There is no indication that Ta Chen lost title to
> any portion of the compensating balance during the POR.
> Therefore, contrary to petitioners' claim, the compensat-
> ing balance cannot be viewed as an interest payment and
> therefore is inappropriate for inclusion in the calcula-
> tion of the short-term interest rate.

Defendants' Supplemental Appendix, p. 27.

The plaintiffs take the position that this compensating
balance should be taken into account when calculating TCSSPL's U.S.
short-term interest rate in order to properly determine credit ex-
penses and inventory carrying cost, which, *inter alia*, are subse-
quently deducted from the gross U.S. price to obtain the con-
structed export price.[22]  The plaintiffs claim that, by disregarding

---

[22] Gross U.S. price is reduced by, among other things, "ex-
penses that result from, and bear a direct relationship to, the
sale, such as credit expenses, guarantees and warranties".  19
U.S.C. §1677a(d)(1)(B).  See also 19 C.F.R. §351.402(a), (b),
clarifying certain adjustments to constructed export price.

> . . . "[T]he imputation of credit cost . . . is a
> reflection of the time value of money," that it "must
> correspond to a . . . . figure reasonably calculated to

(footnote continued)

the compensating balance, the ITA is ignoring the true commercial reality of the cost of doing business. See Plaintiffs' Rule 56.2 Memorandum, pp. 41-43.

The defendants do not disagree about the inherent cost of money but instead repeat the agency's Decision Memorandum that "[t]here is no indication that Ta Chen lost title to any portion of the compensating balance during the POR". They rely on NTN Bearing Corp. of America v. United States, 18 CIT 104, 106, 843 F.Supp. 737, 739, aff'd, 41 F.3d 1519 (Fed.Cir. 1994), wherein the court concluded that the amount of the compensating account available to the account holder was "irrelevant in calculating the interest rate . . . paid." Here, the record reflects neither any interest earned on TCSSPL's compensating balance nor paid, and this court thus cannot conclude that the ITA should have taken that balance into account.

Apparently, during the two fiscal years subject to this discussion, TCSSPL provided TCI with collateral in the form of a promissary note (or loan guarantee), the cost of which was not included in the U.S. short-term interest-rate calculation. The ITA

---

account for such value during the gap period between delivery and payment," and that it should conform with "commercial reality."

Commerce Bulletin 98.2, Imputed Credit Expenses and Interest Rates (Feb. 23, 1998) (internal quotation marks deleted), relying on LMI-La Metalli Industriale, S.p.A. v. United States, 912 F.2d 455, 460-61 (Fed.Cir. 1990).

found that there was no interest due on the note and no reason to impute interest. <u>See</u> Defendants' Supplemental Appendix, p. 27. As the court in <u>Micron Technology, Inc. v. United States</u>, 23 CIT 55, 63, 44 F.Supp.2d 216, 224 (1999), has pointed out,

> without some evidence that actual expenses were incurred or even might have been incurred, [plaintiff's] request to impute costs for loan fees is entirely too speculative and . . . therefore unreasonable.

C

According to the governing statute, export price constructed pursuant to 19 U.S.C. §1677a shall be reduced by

> the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States[.]

19 U.S.C. §1677a(c)(2)(A). The ITA regulation promulgated in conjunction with this statutory provision provides:

> *Allocation of expenses and price adjustments--*
>
> (1) *In general.* The Secretary may consider allocated expenses and price adjustments when transaction-specific reporting is not feasible, provided the Secretary is satisfied that the allocation method used does not cause inaccuracies or distortions.
>
> (2) *Reporting allocated expenses and price adjustments.* Any party seeking to report an expense or a price adjustment on an allocated basis must demonstrate to the Secretary's satisfaction that the allocation is calculated on as specific a basis as is feasible, and must explain why the allocation methodology used does not cause inaccuracies or distortions.

(3) *Feasibility*.  In determining the feasibility of transaction-specific reporting or whether an allocation is calculated on as specific a basis as is feasible, the Secretary will take into account the records maintained by the party in question in the ordinary course of its business, as well as such factors as the normal accounting practices in the country and industry in question and the number of sales made by the party during the period of investigation or review.

(4) *Expenses and price adjustments relating to merchandise not subject to the proceeding*.  The Secretary will not reject an allocation method solely because the method includes expenses incurred, or price adjustments made, with respect to sales of merchandise that does not constitute subject merchandise or a foreign like product (whichever is applicable).

19 C.F.R. §351.401(g).

The plaintiffs complain that the ITA considered allocated expenses in this matter, arguing that TCSSPL did not meet its burden of showing that transaction-specific reporting was not feasible and that the allocation method chosen did not cause inaccuracies or distortions.  See Plaintiffs' Rule 56.2 Memorandum, p. 54. According to the ITA Decision Memorandum, prior to verification the company stated that it had

about 25,000 U.S. sales in this review.  There is no computer record/date base, sale by sale, of the heat number for each sale.  Thus, even if tracing by heat number of each Ta Chen U.S. b/w fitting sale all the way back to Ta Chen Taiwan was viable (it is not), it would have to be done manually for about 25,000 sales.  In such cases, DOC has permitted the simplifying allocation approach done here, even if a more transaction-specific approach was possible, simply because any other approach is too burdensome (especially in the short time permitted to answer DOC questionnaires) as well as the reasonable allocation approach here causes no apparent distortion to the dumping margin calculation.

Defendants' Supplemental Appendix, p. 26.  In its final analysis,
the agency "continue[d] to determine that the POR weighted-average
methodology used by Ta Chen should not be amended".  Id.

This court has not found evidence on the record to
conclude otherwise, nor can it conclude that that approach was not
in accordance with the law quoted above.

### III

In view of the foregoing, the motions of TCSSPL and the
plaintiffs for judgment upon the agency record must be denied,
except for remand to the ITA to reopen the record, seek additional
relevant information regarding employee bonuses, and recalculate
the general and administrative expenses of Ta Chen Stainless Steel
Pipe, Ltd. and also to reconsider its U.S. indirect selling
expenses.

The ITA may have until December 30, 2004 to comply with
this remand and report the results thereof to the court and to the
other parties, which may file comments thereon on or before January
17, 2005.

So ordered.

Decided:  New York, New York
          October 28, 2004


                                    Thomas J. Aquilino, Jr.
                                            Judge